ANTHONY MICHAEL GLASSMAN, admitted *pro hac vice*
ALEXANDER RUFUS-ISAACS, admitted *pro hac vice*
RICHELLE L. KEMLER, admitted *pro hac vice*
GLASSMAN, BROWNING, SALTSMAN & JACOBS, INC.
360 North Bedford Drive, Suite 204
Beverly Hills, California 90210-5157
Telephone: (310) 278-5100
Facsimile: (310) 271-6041

Attorneys for Plaintiff,
DR. FREDERICK K. C. PRICE

## IN THE UNITED STATES DISTRICT COURT FOR

## THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Dr. FREDERICK K. C. PRICE, an individual, <br><br> Plaintiff, <br><br> v. <br><br> JOHN STOSSEL, an individual, GLEN RUPPEL, an individual, AMERICAN BROADCASTING COMPANIES, INC., a Delaware corporation, ABC INC., a Delaware corporation, OLE ANTHONY, an individual, and TRINITY FOUNDATION, INC., an entity, form unknown, <br><br> Defendants. | Case No.   07 CV 11364 (SWK) <br><br> The Honorable Shirley Wohl Kram <br><br> **DECLARATION OF EDWARD FINEGAN IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION TO TRANSFER VENUE** |

170136.1

## DECLARATION OF EDWARD FINEGAN

I, Edward Finegan, declare as follows:

     1.    I have been retained as an expert by Glassman, Browning, Saltsman & Jacobs in the matter of Frederick K.C. Price v. John Stossel, Glenn Ruppell, American Broadcasting Companies, Inc., ABC, Inc., Ole Anthony and Trinity Foundation.

     2.    I have personal knowledge of the facts set forth herein, which are known by me to be true and correct, and if called as a witness, I could and would competently testify thereto.

     3.    This declaration is submitted in support of Plaintiff's Opposition to Defendant's Motion to Transfer Venue pursuant to 28 U.S.C.S. § 1404.

### Background and Qualifications as an Expert

     4.    I hold a Ph.D. from Ohio University and have been a member of the faculty at the University of Southern California since 1968. I am a tenured professor in USC's Department of Linguistics and since 1996 also hold title in its law school, where I lecture to first-year students and their legal writing instructors on the application of linguistic principles to legal drafting. I have written extensively on linguistics and the English language, including many book chapters and articles and eleven books, some of which are used as standard textbooks in North America, Europe, Asia, and elsewhere. I have served as a referee for numerous scholarly journals and book publishers, including Oxford University Press, Cambridge University Press, and the University of Chicago Press, and on the editorial boards of several book series and leading journals, including *English Language and Linguistics*, *American Speech*, and *Discourse Processes*. I am a member of the Linguistic Society

of America, the American Dialect Society, and the Dictionary Society of North America, among others, and in these organizations have served as a member of executive boards, editorial boards, or standing committees.  A true and correct copy of my curriculum vitae is attached hereto as Exhibit "A."

**Assignment and Materials Reviewed**

5.    I have been asked to analyze a segment called "Enough!" which to my understanding was broadcast by ABC on "20/20" (the "Program") on 23 March 2007, and to analyze five teasers for the segment, also broadcast that day on "Good Morning America" (GMA). Among the teasers was one in which Robin Roberts interviewed John Stossel about "Enough!" and showed excerpts from the segment. I also reviewed the correction and apology made by John Stossel on the "20/20" program of 11 May 2007.  I have examined the segment and teasers with a view to what ordinary viewers would understand from them about what ABC News, "20/20," and GMA were claiming about Rev. Fred Price, pastor of Crenshaw Christian Center, and I have examined the correction and apology in the same light.

6.    It is my professional opinion, after reviewing the foregoing materials, that ordinary viewers would understand "Enough!" and its GMA teasers to be claiming that Rev. Fred Price operates a Christian ministry whose parishioners have been deceived into funding an exorbitantly lavish lifestyle for their pastor and that his lifestyle and its ill-gotten financial underpinnings constitute shocking and scandalous behavior.

**The Broadcast**

7.    On 23 March 2007, "20/20" broadcast a segment called "Enough!" Anchored by John Stossel, focused on "preachers" whose luxurious lifestyles, as the program implied, were funded by generous parishioners who naïvely contributed to fraudulent ministries and thus unwittingly supported the extravagant lifestyles.  One of the featured "preachers" was Frederick Price of Crenshaw Christian Center, and a clip ("Clip A") from a sermon of his appears in "Enough!" and in several GMA teasers, as does a clip ("Clip B") of a parishioner speaking enthusiastically about her donations to Rev. Price's ministry.

8.    In his introduction to "Enough!" John Stossel comments about the featured pastors, "They preach the gospel of giving to God.  But how much of what you give do they keep for themselves? Is it time for someone to say 'enough'?"  In my opinion, this comment establishes an overarching framework through which viewers are invited to interpret the segment.  That framework embodies the clear suggestion that the "preachers" persuade donors to support charitable works ("giving to God") but misappropriate the donations ("keep for themselves") to fund their own lavish lifestyles.

**Analysis of Enough!**

9.    In his introduction to "Enough!" John Stossel says this of the featured pastors:

> They preach the gospel of giving to God.  But how much
> of what you give do they keep for themselves?

Then, following a clip (Clip B) in which a parishioner emphatically expresses her conviction that her donations are put to "excellent" use, Stossel retorts:

> And yet her pastor, Fred Price, boasts that [here begins Clip A from a sermon in which Price says] I live in a 25-room mansion, I have my own six-million-dollar yacht, I have my own private jet, and I have my own helicopter, and I have seven luxury automobiles.

10.    In my opinion, the interpretation for viewers is patent: Despite the naïve belief of parishioners like the one in Clip B, Rev. Price owns a 25-room mansion, a yacht, a jet, a helicopter, and seven luxury automobiles, all acquired illegitimately from donors intending to honor "the gospel of giving to God." The implicit question is: Where did Rev. Price get the money to fund such luxuries? And the implicit answer is that he must fund them from the contributions of unwitting parishioners.

11.    Let me call Stossel's introduction to the sermon ("And yet her pastor, Fred Price, boasts that") a matrix clause and Price's words ("I live ...") a complement clause. In my opinion, by merging Stossel's matrix and Price's complement clauses, the "20/20" producers manufactured an audio and video text from which viewers could not possibly recognize that, in the actual sermon from which Clip A comes, Price was not claiming he owned those luxury items and, far from boasting about himself, was instead talking in a parable-like fashion about an imaginary person. The manufactured text—and its placement following the protestations of a parishioner who believed her contributions

were being put to "excellent" use—conveyed the unmistakable impression that Price

owned all the itemized luxuries and was living an outrageously lavish lifestyle on the

backs of parishioners who falsely believed their donations were a way of "giving to

God."

12.    Further, Price's speaking in the first person ("I") as part of Stossel's claim

constitutes a powerfully persuasive textual product, calculated not merely to create an

impression of reliability, accuracy, and truth but to provide direct evidence for it in the

voice of Rev. Price himself:

> And yet her pastor, Fred Price, boasts that "I live in
> a 25-room mansion, I have my own six-million-dollar
> yacht, I have my own private jet, and I have my own
> helicopter, and I have seven luxury automobiles."

13.    Equally significant, in my opinion, is the expression "And yet" with which

Stossel opens his matrix accomplishes two goals. "And" serves grammatically to link

the manufactured claim to the parishioner's words in Clip B, which precedes the claim.

Semantically, however, "yet" serves to undermine, even to contradict, the parishioner's

expressed belief that her contributions are put to "excellent" use. The distinct and

inevitable impression suggested by Stossel's "and yet" linkage of the parishioner's

expressions of trust with the first-person declaration by her pastor that he owns all those

luxury items is that the parishioner has been duped.

14.    As a follow-up to what I believe to be misleading clips, Stossel comments about Price, "At least he tells people about it!" Linguistically, "it" is shorthand for something like "how well he lives." In context, however, "it" refers to the lavish lifestyle he is leading *on the backs of deceived parishioners,* and viewers will readily infer that Price's lifestyle is somehow funded illegitimately by church donations such as those made by the parishioner seen in Clip B. The very premise of "Enough!" is that the lavish lifestyles of the featured preachers are funded illegitimately from donations intended for other purposes.

15.    Not far into the segment, Stossel introduces Rusty Leonard, founder of Ministry Watch. Then as photographs of Rev. Price and the other featured preachers are shown to viewers, Stossel says of Leonard:

> --he thought it was unchristian that he and he and she
> and so many others ask donors for money but don't
> reveal exactly how they spend it. He says donors are
> being hosed.

16.    Although, in my opinion, "Enough!" casts Price as boasting about his possessions, the context and certain other comments in the segment make clear how parishioners might nevertheless be hoodwinked. Stossel says to Leonard, "Some donors you call dumb!" In responding to that, Leonard says, "I guess we're all dumb," and he adds, "all the satisfaction we get is in the act of giving, not in making sure that actual good work gets done." "20/20" thus makes plausible what it says is Rev. Price's boasting

about his possessions and what it implies is his misappropriation of much of what his parishioners intend to be "giving to God."

17.    Let me return briefly to the text manufactured by blending Stossel's matrix clause and Price's complement. Through that blending, I believe "Enough!" succeeds at making plain and obvious that Fred Price owns, and "boasts" about owning, a mansion, a yacht, a jet plane, a helicopter, and seven luxury automobiles.  In this case, however, what is made to seem obvious is nonetheless false. In the part of the sermon captured in Clip A, Price is not referring to himself when he says "I."  Rather, he is portraying an imaginary man with great material possessions (mansion, yacht, etc.), and the very point of the sermon is to draw a contrast between material possessions and spiritual riches. Using "I" to represent a fictional voice, Price's parable depicts an imaginary man, as anyone hearing the sermon would recognize instantly. By contrast, viewers experiencing Clip A as it was woven into the text of "Enough!" would have been grossly misled about Rev. Price and his "boasting."

**Analysis of Good Morning America Teasers**

18.    As with the "20/20" Program itself, it is my opinion that the GMA teasers, including Robin Roberts's interview with Stossel, portray Rev. Fred Price as a preacher who illegitimately accumulated extraordinary wealth from naïve parishioners.

19.    It is my opinion that in general, as represented in GMA's teasers, the portrait of Rev. Price and the other "preachers" featured on the "20/20" Program is nothing short of sensational. Diane Sawyer's comments and the tone in which she voices

them create a sense of incredulity, shock, and scandal. As in much else related to

"Enough!" the sense of incredulity, shock, and scandal that characterizes the teasers

contributed to a frame through which viewers were led to anticipate a portrait of

indecent, deceitful, hypocritical, and outrageous behavior by some of those who preach

the word of God and the gospel of giving.  Among the featured preachers is Rev. Fred

Price, who is seen (though not heard) in three of the teasers and then seen and heard in

the interview.

    20.    In the teasers, which are interlaced with video footage of mansions, Rolls

Royces, and the like, as well as of Rev. Fred Price and other preachers, Diane Sawyer

says the following:

    i.    `Six-million dollar yachts, private jets, Rolls`
        `Royces! Sound like the good life? What about the`
        `godly life?  John Stossel takes us inside the lives`
        `of some preachers, and says, "enough."`

    ii.    `Look at these mansions, this Rolls Royce!  Think`
        `they're owned by moguls? No, they're owned by`
        `preachers!  And John Stossel is here to say,`
        `"enough."`

    iii.  `Does this look like something out of "Lifestyles of`
        `the Rich and Famous"? If it's your guess, you are`
        `wrong. These are preachers! PREACHERS!`
        `(Here a host substituting for Chris Cuomo says, "I`
        `know! Preachers flying around—imagine this—on`

```
private jets and lounging on multi-million dollar
yachts!") And wouldn't you know that John Stossel
himself has said "enough"?
```

iv.  Mansions, yachts, Rolls Royces—the jet-set life?
     Guess again! How some major league PREACHERS really
     live.  John Stossel here to say, "enough."

21.    In teaser (i), Sawyer contrasts the "godly life" normally expected of pastors

with the "good life" actually lived by the featured preachers, the good life that in teaser

(iii) she characterizes as "something out of 'Lifestyles of the Rich and Famous,'" an

earlier television show displaying luxury and indulgence. In teaser (iii), Sawyer says

with an incredulous tone and increasing emphasis, "These are preachers!

PREACHERS!"

22.    From Ms. Sawyer's incredulity, I believe viewers might draw two

conclusions. They could conclude that the good life and the godly life are incompatible

(a theme echoed in Robin Roberts's interview with John Stossel) and preachers should

choose a godly life. They could conclude that preachers leading such a "good life" must

be doing so by ungodly means.  The second conclusion follows from recognizing that

preachers are agents for charitable projects, using donors' contributions in worthy

causes, not self-enrichment, and that donors make contributions in the belief that their

"giving to God" will support worthy causes.

23.    The teasers constitute headlines for GMA's interview with John Stossel and

his "20/20" segment "Enough!"  They caption and highlight major themes and pivotal

aspects of the story as viewers are intended to perceive them. Consequently, Sawyer's expressions of incredulity at the lifestyles of the featured pastors and her being scandalized by their "jet-set life" constitute headlines for the interview and the "20/20" Program. In my opinion, directly and patently they convey to viewers Sawyer's belief that the featured preachers are leading scandalously luxurious lifestyles; indirectly they raise questions about whether the funds that support those lifestyles are misappropriated from church donations. Indirection, tone of voice, and implication, as well as simple questions, are powerful linguistic tools, as powerful as direct claims and statements.

24.     Although questions are not generally viewed as true or false, the processes of conversational implicature make them powerful communicative tools when they are effectively contextualized. As an illustration, assume that A asks B whether Ronald Reagan was a Republican, and B replies, "Is the pope Catholic?" If B has rightly assessed A's world knowledge, A will have no doubt about the meaning of B's reply despite its interrogative form and disguised relevance. In accordance with a well-established "cooperative principle," interlocutors (that would include television viewers) endeavor to make sense of other people's linguistic communication by making assumptions about what others are aiming to convey. Given conversational implicature and the cooperative principle, it is not accidental that Diane Sawyer poses a question in each of the four small teasers: "What about the godly life?" "Think they're owned by moguls?" "Does this look like something out of 'Lifestyles of the Rich and Famous'?" "Mansions, yachts, Rolls Royces—the jet-set life?"

25.    Nor is there any doubt, in my opinion, about the power of indirect statements in conveying distinct impressions. Imagine A asking B whether their boss has gone home for the day and B answering, "Light's on in her office and jacket's still there." The reply appears not responsive, but it answers the question indirectly. Using conversational implicature, A will readily construe an accurate interpretation of B's reply by recognizing that B has provided a basis for believing the boss remains at work. Office light and jacket may not on the surface speak to boss's location. However indirectly, though, it is clear that B intends the reply to suggest a belief that the boss remains at work. B has provided the evidence from which A can draw the conclusion. A similar indirection characterizes the consistent answer to Diane Sawyer's questions given above. Her indirect answer is that John Stossel is here to say "Enough!"—as she says in each teaser. But enough of what? Viewers are left to make the connection. In my opinion, the tone of the teasers plainly suggests that Stossel says "enough" to a bad thing. In my opinion, as well, that bad thing, the one that prompts outrage and gives scandal is the deceit by which contributors are duped by the preachers. Viewers would have had no difficulty recognizing this indirect claim.

**Analysis of Robin Roberts and John Stossel Interview**

26.    A segment in my opinion that is itself an elaborate teaser for the "Enough!" segment, the interview by GMA's co-host Robin Roberts of John Stossel about the upcoming "20/20" Program warrants separate analysis.  The interview is in the first instance what the preceding short teasers have pointed to, and it includes some footage

from "Enough!" and captures its essence.   Combined, the teasers and interview aim in part to promote the "20/20" Program itself.

27.    In a serious tone of voice and before turning to Stossel for the interview, Robin Roberts addresses this observation to her audience:

> "The Bible discusses how difficult it is for the
> wealthy to reach heaven, but that hasn't kept some
> preachers from attaining vast fortunes."

Thus invoking the sacred books of the Judeo/Christian tradition, she establishes a framework through which viewers are invited to interpret the contents of the interview. That framework denigrates the rich ("how difficult it is for the wealthy to reach heaven"), draws a contrast between biblical precepts and the "vast fortunes" of some preachers, and implicitly raises questions about the legitimacy of these "vast fortunes."

28.    John Stossel, in turn, takes up the subject of where the preachers' money comes from, and his comments and the excerpts from "Enough!" shown in the interview would leave no doubt in the minds of viewers, in my opinion, as to what he takes to be their source. I believe the clear implication to be drawn from this interview is that the pastors featured in "Enough!" have gained their riches by exploiting credulous followers duped into believing their "giving to God" would not go to preachers' personal bank accounts. In excerpts from "Enough!" Stossel says about the pastors, "The givers are confident that they will [put the donations to good use]." Then follows Clip B, portraying one of Rev. Price's parishioners declaring her belief that her donations are put

to "excellent" use. Stossel adds, "And yet her pastor, Fred Price, boasts that" (and here starts the misleading Clip A from Price's sermon, discussed above). I believe the unmistakable implication to be drawn from the language and clips here is that, despite parishioners' confidence that their donations serve excellent causes, Rev. Price and some other religious leaders use the donations to fund lavish lifestyles for themselves.

29.    It is my opinion that viewers of the Roberts/Stossel interview on GMA would understand that ABC and "20/20" were claiming that Rev. Fred Price had illegitimately taken millions of dollars from his unsuspecting parishioners to sustain a lavishly exorbitant lifestyle for himself. Significantly, viewers would have derived that understanding largely on their own from evidence they had reason to believe they could evaluate themselves—namely, the very words of Rev. Price as he himself spoke them. Regrettably, as I showed above, the evidence on which viewers come to their understanding about Rev. Price was manufactured by patching a first-person complement clause in his voice into a matrix clause spoken by Mr. Stossel. The resulting "evidence" was thus not valid evidence at all.

**Analysis of Correction and Apology**

30.    On the "20/20" program I reviewed, which to my understanding was broadcast on 11 May 2007, John Stossel announced that he wanted "to correct a mistake" made in the earlier Program. These are his words:

> Now I want to correct a mistake we made. Several weeks ago, in a story about the financial openness

of Christian ministries, we aired this clip of
televangelist Frederick Price.

[Clip A, showing Rev. Price's sermon:] "I live in
a 25-room mansion, I have my own six-million-
dollar yacht, I have my own private jet, and I
have my own helicopter, and I have seven luxury
automobiles."

[Stossel resumes speaking:] We thought Dr. Price,
founder of Crenshaw Christian Center, was talking
about himself, but we later learned he was
preaching a sermon about a hypothetical person who
had many material possessions but lived a
spiritually unfulfilled life.  We'd used this
quote out of context and for that we apologize to
Dr. Price and the Crenshaw Christian Center. And
we apologize to you if we misled you.

Also the Center sent us a statement saying Dr.
Price is paid quote a salary commensurate with his
duties and that the church quote openly shares its
financial information with its congregation.

31.    In my view, it is inaccurate to say, as Stossel does, "We'd used this quote

out of context." More accurately, "20/20" manufactured a context in which Rev. Price's

embedded words were guaranteed to convey a false impression. Moreover, in the

correction Stossel repeated the falsehood by showing Rev. Price again uttering the very

same words that had been made to mislead viewers in the first place. Only after

rebroadcasting Clip A did Stossel indicate the true context of Rev. Price's sermon and the imaginary speaker referred to by Rev. Price's use of "I." [1]

32.    In my expert opinion, the form in which "20/20" broadcast and rebroadcast the clip from his sermon, Rev. Price is made to claim things he was not claiming. Indeed, he is made to speak words uttered by an imaginary person.[2] Calling the gross misrepresentation created by Stossel's matrix clause coupled with Price's complement clause a matter simply of taking a "quote out of context" is, in my opinion, akin to calling a mountain a molehill.

33.    Further, in my opinion, Mr. Stossel's apology is conditional. He says, "if we misled you," thereby suggesting the possibility that he and the producers of "20/20" believe Clip A might not have misled viewers. Such a belief would be preposterous in my estimation. More seriously, the conditional apology may suggest that, despite the correction, the implications about Rev. Price that were created by "Enough!" and falsely supported by Clip A may yet be true. In my opinion, it is incontrovertible that the

---

[1] "I" is a "deictic" pronoun; as such, its referent varies with context. "I" can refer to anyone who is speaking but also for someone other than the speaker in a real or fictional quote. In Rev. Price's sermon, "I" referred to an imaginary person, as would have been obvious to anyone hearing the sermon. In a different context and in the absence of a reason to do otherwise, hearers would naturally take Price's "I" to be self-referential.

[2] Consider an analog: Were Dove videotaped saying, "Sparrow said, 'I killed Cock Robin,'" and were the other creatures of the forest to view only that portion of the tape with the words, "I killed Cock Robin" (but not "Sparrow said,"), the creatures would mistakenly believe Dove to have confessed to killing Cock Robin when (assuming the truth of Dove's report) it was Sparrow who so confessed.

original broadcast was patently misleading, and a conditional apology suggests otherwise. [3]

34.   In my opinion, viewers could hardly have been misled about what the original Program intended to claim in portraying Rev. Price "boasting" about his wealth, ill-gotten as the Program suggested it was.  Rather than being conditionally misleading ("if"), Clip A and the segments in which it was used were *inherently* misleading. A genuine and forthright apology might have included words more akin to these: "The producers of "20/20" and I apologize for misleading you."

## Conclusion

35.   It is my opinion that viewers of ABC's "Good Morning America" on 23 March 2007 and its "20/20" segment "Enough!" on the same day would have wrongly understood from those programs that Rev. Fred Price was living the life of "the rich and famous" at the expense of unwitting parishioners who thought they donated to worthy causes but were instead supporting their pastor's exorbitant life style.

36.   It is also my opinion that the "correction" made on the "20/20" broadcast of 11 May 2007 did less than necessary to correct the false impressions conveyed by the earlier programs. In fact, rebroadcasting Clip A, may have reinforced the initial impression conveyed by the GMA teasers and interview and the original "Enough!"

---

[3] To be fair, it is possible to interpret "And we apologize to you if we misled you" to mean something like, "We apologize to any of tonight's viewers who may also have viewed the earlier 'Enough!' show." If that is what was intended, Stossel could have said

broadcast. Viewers who saw only the GMA program or only "Enough!" and viewers who saw both of them but not the "correction" would almost certainly continue to maintain a seemingly well-founded, but grossly false, impression that Rev. Price owned all of the material possessions named in Clip A and acquired them illegitimately. Viewers who saw the correction would have had reason to reconsider their impressions, although the conditional nature of the correction may not have persuaded them to discard those impressions completely.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed April 3, 2008, at _Morro Bay_____, California.

_Edward Finegan_

Edward Finegan

---

as much; from the fact that he did not, I conclude he likely meant otherwise.

Appendix A

# EDWARD FINEGAN

Department of Linguistics  GFS 301
University of Southern California
Los Angeles, California  90089-1693
Tel: 213-740-2986

**PROFESSIONAL EXPERIENCE**
American Dialect Society Professor of Linguistics, Linguistic Society of America Summer
    Institute, Stanford University, 2007
Professor of Linguistics and Law, University of Southern California, 1996—
Visiting Professor of Linguistics, Linguistic Society of America Summer Institute, University of
    California, Santa Barbara, 2001
Visiting Professor of English, University of Zurich, Spring/Summer 1998
Professor of Linguistics, University of Southern California, 1983-96
Fellow in Law and Linguistics, Harvard University, 1988-89
Director, American Language Institute/National Iranian Radio and Television (Tehran), 1975-76
Chairman, Department of Linguistics, University of Southern California, 1969-75
Associate Professor of Linguistics and English, University of Southern California, 1970-83
Assistant Professor of English and Linguistics, University of Southern California, 1969-70
Assistant Professor of English, University of Southern California, 1968-69
Instructor, English and Linguistics, Case Western Reserve University, 1967-68
Visiting Assistant Professor of English, Case Western Reserve University, Summer 1967
Instructor in English, Case Institute of Technology, 1966-67
Instructor in English, Ohio University, Summer 1964; Spring, Fall, 1965
Instructor in Mathematics, West Hempstead (New York) Jr.-Sr. High School, 1962-63

**EDUCATION**
B.S., Iona College, 1962
M.A., Ohio University, 1964
  University of Michigan, Linguistics Institute, 1965
Ph.D., Ohio University, 1968

Post-doctoral studies:
  New York University, Summer 1968
  Ohio State University, Linguistics Institute, 1970
  Harvard Law School, 1988-89

**HONORS**
Albert S. Raubenheimer Distinguished Faculty Award, USC, 2004
General Education Teaching Award, USC College, 2001
Diploma of Honor, Phi Kappa Phi, USC Chapter, 1998
President, Phi Kappa Phi All-University Honor Society, USC Chapter, 1998-99; 2003-2004

*Language Learning* Distinguished Scholar-in-Residence, Universidad de las Americas-Puebla, Mexico, October 1995
Faculty of Arts Visiting Scholar, University of Helsinki, May 1996
Liberal Arts Fellow, Harvard Law School, 1988-1989
Albert S. Raubenheimer Distinguished Faculty Award, USC, 1981
Associates Award for Excellence in Teaching, USC, 1980
Visiting Scholar, Linguistics Institute, Ohio State University, 1970
Phi Kappa Phi, Ohio University, 1964
NDEA Graduate Fellowship, Ohio University, 1963-1966
Henry L. Logan Award, Excellence in Science, Iona College, 1962

## PUBLICATIONS
### Books
1.  Edward Finegan. *Language: Its Structure and Use*, 5th ed. Wadsworth, 2008
2.  Paul Frommer & Edward Finegan. *Looking at Languages*, 4th ed. Wadsworth, 2008
3.  Edward Finegan & John R. Rickford, eds. *Language in the USA: Themes for the Twenty-first Century*. Cambridge University Press, 2004
4.  Edward Finegan. *Language: Its Structure and Use*, 4th ed. Wadsworth, 2004
5.  Paul Frommer & Edward Finegan. *Looking at Languages*, 3rd ed. Wadsworth, 2004
6.  Edward Finegan. *Language: Its Structure and Use*, 3rd ed. Harcourt Brace, 1999
7.  Paul Frommer & Edward Finegan. *Looking at Languages*, 2nd ed. Harcourt Brace, 1999
8.  Douglas Biber, Stig Johansson, Geoffrey Leech, Susan Conrad, Edward Finegan. *The Longman Grammar of Spoken and Written English*. Longman, 1999
9.  Douglas Biber & Edward Finegan, eds. *Sociolinguistic Perspectives on Register*. Oxford University Press 1994
10. Edward Finegan. *Language: Its Structure and Use*, 2nd ed. Harcourt Brace, 1994
11. Paul Frommer & Edward Finegan. *Looking at Languages*. Harcourt Brace, 1994
12. Edward Finegan & Niko Besnier. *Language: Its Structure and Use*. Harcourt, 1989
13. Edward Finegan. *Attitudes toward English Usage*. Teachers College Press, Columbia University, 1980

### Articles, Book chapters
1.  Edward Finegan, "Response to Louis C. Schaedler, 'Call Me Scientist'." *College Composition and Communication* 18 (1967), 148-50
2.  Edward Finegan, "Linguistics and Attitudes toward Usage during the Last Decade." *Pacific Coast Philology* 6 (1971), 20-25
3.  Edward Finegan, "Form and Function in Testament Language." R. DiPietro, ed. *Linguistics and the Professions*. Ablex (1982), 113-20
4.  Edward Finegan, "Unconscious Attitudes toward Linguistic Variation." In S. Greenbaum, ed., *The English Language Today*. Pergamon Press (1985), 92-98
5.  Edward Finegan & Douglas Biber. "Two Dimensions of Linguistic Complexity in English." In J. Connor-Linton et al., eds., *Social and Cognitive Perspectives on Language* (Southern California Occasional Papers in Linguistics 11) (1986), 1-23
6.  Edward Finegan & Douglas Biber. "Toward a Unified Model of Sociolinguistic Prestige." In D. Sankoff, ed., *Diversity and Diachrony*. Benjamins (1986), 391-98

2

7. Douglas Biber & Edward Finegan. "An Initial Typology of English Text Types." In J. Aarts & W. Meijs, eds. *Corpus Linguistics II*. Rodopi (1986), 19-46

8. Edward Finegan. "English." In B. Comrie, ed. *The World's Major Languages*. Oxford University Press (1987), 77-109

9. Edward Finegan. "On the Linguistic Forms of Prestige: Snobs and Slobs Using English." In P. Boardman, ed. *The Legacy of Language: A Tribute to Charlton Laird*. U of Nevada Press (1987), 146-61

10. Douglas Biber & Edward Finegan. "Adverbial Stance Types in English." *Discourse Processes* 11 (1988), 1-34

11. Douglas Biber & Edward Finegan. "Drift in Three English Genres from the 18th to the 20th Centuries: A Multidimensional Approach." In M. Kyto et al., eds., *Corpus Linguistics, Hard and Soft.* Rodopi (1988), 83-101

12. Douglas Biber & Edward Finegan. "Historical Drift in Three English Genres." In T. Walsh, ed., *Synchronic and Diachronic Approaches to Linguistic Variation and Change.* Georgetown University Press (1989), 22-36

13. Douglas Biber & Edward Finegan. "Styles of Stance in English: Lexical and Grammatical Marking of Evidentiality and Affect." *Text* 9 (1989), 93-124

14. Douglas Biber & Edward Finegan. "Drift and the Evolution of English Style: A History of Three Genres." *Language* 65 (1989), 487-517

15. Edward Finegan. "Variation in Linguists' Analyses of Author Identification." *American Speech* 65 (1990), 334-40.

16. Douglas Biber & Edward Finegan. "On the Exploitation of Computerized Corpora in Variation Studies." In K. Aijmer & B. Altenberg, eds., *English Corpus Linguistics: Studies in Honour of Jan Svartvik.* Longman (1991), 204-20.

17. Edward Finegan. "English." In W. Bright, ed. *Oxford International Encyclopedia of Linguistics.* Oxford University Press (1992).

18. Edward Finegan. "Linguistics." In J. Gibaldi, ed. *Research in the Modern Languages and Literatures.* Modern Language Association (1992), 3-27.

19. Edward Finegan. "Style and Standardization in England: 1700-1900." In T. Machan & C. Scott, eds., *English in Its Social Contexts: Essays in Historical Sociolinguistics.* Oxford University Press (1992), 102-30.

20. Douglas Biber & Edward Finegan. "The Linguistic Evolution of Five Written and Speech-Based English Genres from the 17th to the 20th Centuries." In M. Rissanen et al., eds. *History of Englishes: New Methods and Interpretation in Historical Linguistics.* Mouton (1992), 688-704.

21. Edward Finegan. "Ethical Considerations for Expert Witnesses in Forensic Linguistics." *Issues in Applied Linguistics* 4 (1993), 179-87.

22. Douglas Biber, Edward Finegan, D. Atkinson. "ARCHER and Its Challenges: Compiling and Exploring a Representative Corpus of Historical English Registers." In U. Fries et al., eds. *Creating and Using English Language Corpora.* Rodopi (1994), 1-13.

23. Douglas Biber & Edward Finegan. "Variation within Medical Research Articles." In N. Oostdijk & P. de Haan, eds., *Corpus-based Research into Language.* Rodopi (1994), 201-21.

24. Douglas Biber & Edward Finegan. "Introduction: Situating Register in Sociolinguistics." In Biber & Finegan, eds., *Sociolinguistic Perspectives on Register.* Oxford University Press (1994), 1-12.

3

25. Edward Finegan & Douglas Biber. "Register and Social Dialect Variation: An Integrated Approach." In Douglas Biber & Edward Finegan, eds., *Sociolinguistic Perspectives on Register*. Oxford University Press (1994), 315-47.

26. Edward Finegan. "Standard English." In A. Purves, ed., *Encyclopedia of English Studies and Language Arts*. Scholastic Inc. (1994).

27. Edward Finegan & Douglas Biber. "*That* and Zero Complementisers in Late Modern English." In B. Aarts & C. Meyer, eds., *The Verb in Contemporary English*. Cambridge University Press (1995), 241-57.

28. Edward Finegan. "Subjectivity and Subjectivisation in Language: An Introduction." In S. Wright & D. Stein, eds., *Subjectivity and Subjectivisation in Language*. Cambridge University Press (1995), 1-15.

29. Edward Finegan. "What Is 'Correct' Language?: Prescriptivism vs. Descriptivism." *The Field of Linguistics*, Linguistic Society of America. [www.lsadc.org/info/ling-fields-prescrip.cfm]

30. Douglas Biber & Edward Finegan. "Diachronic Relations among Speech-based and Written Registers in English." In T. Nevalainen and L. Kahlas-Tarkka, eds. *To Explain the Present: Studies in the Changing English Language in Honour of Matti Rissanen. Mémoires de la Société Néophilologique de Helsinki*, 52 (1997), 253-75.

31. Edward Finegan & Douglas Biber. "Relative Markers in English: Fact and Fancy." In U. Fries *et al.*, eds. *From Ælfric to the New York Times: Studies in English Corpus Linguistics*. Amsterdam: Rodopi (1997), 65-78.

32. Edward Finegan. "Sociolinguistics and the Law." In F. Coulmas, ed. *The Handbook of Sociolinguistics*. Blackwell (1997), 421-35.

33. Edward Finegan. "English Grammar and Usage." In S. Romaine, ed. *Cambridge History of the English Language*, Vol. 4. Cambridge University Press (1998), 536-88.

34. Edward Finegan. "Practicing Prescriptivism Now and Then." *American Speech* 75 (2000), 247-49. Repr. *Vocabula Review* 3,2 (2001). http://www.vocabula.com/VRFeb01Finegan.htm.

35. Edward Finegan & Douglas Biber. "Register Variation and Social Dialect Variation: The Register Axiom." In P. Eckert & J. Rickford, eds., *Style and Sociolinguistic Variation*. Cambridge University Press (2001), 235-67.

36. Edward Finegan. "Usage." In J. Algeo, ed., *Cambridge History of the English Language*, Vol. 6. Cambridge University Press (2001), 358-421.

37. Edward Finegan. "Linguistic Prescription: Familiar Practices and New Perspectives," *Annual Review of Applied Linguistics* 23 (2003), 213-24.

38. Edward Finegan. "English." In W. Frawley. ed. *Oxford International Encyclopedia of Linguistics*, 2nd ed. Oxford University Press (2003).

39. Edward Finegan, "The Distinctiveness of American English." In E. Finegan and J. R. Rickford, eds., *Language in the USA*. Cambridge University Press (2004), 18-38.

40. Edward Finegan, "The Possibilities and Limits of Corpus Linguistic Description/ Möglichkeiten und Grenzen korpuslinguistischer Beschreibung." In U. Ammon, N. Dittmar, K. Mattheier, and P. Trudgill, eds., *Sociolinguistics/Soziolinguistik: An International Handbook of the Science of Language and Society/Ein Internationales Handbuch Zur Wissenschaft Von Sprache Und Gesellschaft*, 2nd ed. Berlin: Walter De Gruyter (2005). Pp. 1095-1103.

41. Edward Finegan, "English in North America." In R. Hogg and D. Denison, eds., *A History of the English Language*. Cambridge University Press (2006). Pp. 384-419.

4

42. Edward Finegan. "English." In B. Comrie, ed. *The World's Major Languages*, 2nd ed. Routledge (in press).

**Book reviews**
1. *Constituent Structure* by Paul Postal. *Word* 12 (1966), 325-32.
2. *The Roots of Modern English* by L. Myers. *Choice* IV (1967), 1118.
3. *Writing Transformational Grammars* by A. Koutsoudas. *Choice* IV (1968), 1376.
4. *Dimensions of Dialect* by E. Evertts, ed. *Choice* V (1968), 240.
5. *Dictionary of Word and Phrase Origins II* by W. & M. Morris. *Choice* V (1968), 1290.
6. *An Introduction to General Linguistics* by F. P. Dinneen. *Choice* V (1969), 1576.
7. *Attitudes toward English Usage* by W. H. Mittins et al. *Language* 49 (1973), 939-43.
8. *Western Histories of Linguistic Thought* by E.F.K. Koerner. *Language* 58 (1982), 239.
9. *Linguistic Atlas of Middle and South Atlantic States* by McDavid & O'Cain. *Language* 58 (1982), 244-45.
10. *The Role of Prescriptivism in American Linguistics, 1820-1970* by G. Drake. *Language in Society* 12 (1983), 284-85.
11. *The Power of Babel* by M. Pierssens. *Language* 59 (1983), 461.
12. *Understanding Written Language* by A. J. Sanford & S. C. Garrod. *Language* 59 (1983), 461-62.
13. *Computer Corpora in English Language Research* by S. Johansson, ed. *Language* 60 (1984), 190-91.
14. *Variation Omnibus* by D. Sankoff & H. Cedergren, eds. *Language* 60 (1984), 198.
15. *Linguistics, Language, and Law: A Topical Bibliography* by J. Levi. *Language* 60 (1984), 199-200.
16. *Language: The Social Mirror* by E. Chaika. *Language* 61 (1985), 729-30.
17. *Introduction to the Sociology of Language* by F. Penalosa. *Language* 61 (1985), 728-29.
18. "Good News on the 'Literacy Crisis'." Rev. of *On Literacy: The Politics of the Word from Homer to the Age of Rock* by R. Pattison. *American Speech* 60:4 (1985), 354-57.
19. *The English Language: A Historical Introduction* by C. Barber. *Linguistics* (1995), 385-88.
20. *Variation in Australian English: The Sociolects of Sydney* by B. Horvath. *Language* 63 (1987), 193-94.
21. *Language and Social Networks*, 2nd ed. by L. Milroy. *Language* 65 (1989), 670-71.
22. *Good English and the Grammarian* by S. Greenbaum. *Language* 65 (1989), 662-63.
23. *Text and Corpus Analysis* by Michael Stubbs. *Computational Linguistics* 23 (1997), 487-89.
24. *Language and Law: A Bibliographic Guide to Social Science Research in the U.S.A.* by J. Levi. *Forensic Linguistics* 4 (1997), 303-304.
25. *Nineteenth-Century English* by Richard W. Bailey. *Language in Society* 29 (2000), 291-94.
26. *Legal Language* by Peter M. Tiersma. *Forensic Linguistics* 7 (2000), 123-27.
27. *Dictionaries: The Art and Craft of Lexicography, 2nd ed.* by S. I. Landau. *Dictionaries* 24 (2003), 260-68.

**MAJOR RESEARCH FUNDING**
"Diachronic Relations among Speech-Based and Written Registers in English." National Science Foundation Grant BNS-9019893. 11/90-4/92 (Douglas Biber & Edward Finegan, principal investigators)

**MEMBERSHIP IN PROFESSIONAL ORGANIZATIONS**
Linguistic Society of America, Dictionary Society of North America, American Dialect Society, International Linguistics Association, International Association of Forensic Linguists.

**MEMBERSHIP ON EDITORIAL BOARDS AND CONSULTANCIES**
Consulting Editor, Croom Helm Linguistics Series 1987-1990; General Editor, Oxford Studies in Sociolinguistics, 1988-2002; Member, Editorial Board, *Discourse Processes*, 1983-2002; Member, Editorial Board, *American Speech*, 1985-1988; Member, Editorial Board, *The Writing Instructor*, 1986-1992; Member, Editorial Board, *Journal of English Language and Linguistics*, 1996-2006; Member, Editorial Board, *Corpora,* 2005-present; Member, Editorial Advisory Board, Edinburgh Textbooks in Empirical Linguistics, 1995-present; Member, Editorial Advisory Board, Advances in Corpus Linguistics, 2000-present

**Consultant for Publishers and Journals**
Publishers: Academic Press, Blackwell, Cambridge University Press, Continuum, Edward Arnold, Edinburgh University Press, Harcourt Brace, Macmillan, McGraw-Hill, Modern Language Association, National Council of Teachers of English, Oxford University Press, Palgrave Macmillan, Routledge, St. Martin's, University of Chicago Press.
Journals: *American Speech, Discourse Processes*, *Forensic Linguistics, Journal of Linguistic Anthropology, Journal of Pragmatics, Journal of Sociolinguistics, Language, Language in Society, Linguistics, Publications of the American Dialect Society (PADS), Southwest Journal of Linguistics.*

6